UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, </br></br>and </br></br>STATE OF ILLINOIS </br></br>and </br></br>STATE OF NEW YORK </br></br>and </br></br>COMMONWEALTH OF MASSACHUSETTS </br></br>*Plaintiffs*, </br></br>v. </br></br>MARQUEE HOLDINGS, INC. </br></br>and </br></br>LCE HOLDINGS, INC. </br></br>*Defendants*. | Civil Action No. 05-CV-10722 KMW </br></br>Filed: December 22, 2005 </br></br>ECF CASE |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, and the States of Illinois and New York, and the Commonwealth of Massachusetts, acting through their Attorneys General, bring this civil antitrust action to prevent the proposed merger of Marquee Holdings, Inc. and LCE Holdings, Inc. If the merger is

1

permitted to proceed, it would combine the two leading, and in some cases only, operators of first-run, commercial movie theatres in Chicago North, Midtown Manhattan, downtown Seattle, downtown Boston, and north Dallas. The merger would substantially lessen competition and tend to create a monopoly in the theatrical exhibition of commercial, first-run movies in the above listed markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## I. JURISDICTION AND VENUE

1.  This action is filed by the United States pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to obtain equitable relief to prevent a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18. The States of Illinois and New York, and the Commonwealth of Massachusetts bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent the defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

2.  Both defendants operate theatres in this District. The distribution and exhibition of commercial, first-run films is a commercial activity that substantially affects, and is in the flow of, interstate trade and commerce. The defendants purchase substantial quantities of equipment, services, and supplies from sources located outside of New York. In particular, most of the distributors from whom the defendants license films are located outside of New York. The defendants also acquire funding for their New York operations from outside of New York. The Court has jurisdiction over the subject matter of this action and jurisdiction over the parties pursuant to 15 U.S.C. §§ 22, 25, and 26, and 28 U.S.C. §§ 1331 and 1337.

3.  Venue in this District is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c).

## II.  DEFENDANTS AND THE PROPOSED MERGER

4. Defendant Marquee Holdings, Inc. ("Marquee") is a Delaware corporation with its headquarters in Kansas City, Missouri.  It is the holding company of AMC Entertainment Inc. ("AMC").  AMC owns or operates 216 theatres containing 3,300 screens at locations throughout the United States.

5. Defendant LCE Holdings, Inc. ("LCE") is a Delaware corporation with its headquarters in New York City, New York.  It is the holding company of Loews Cineplex Entertainment Corporation ("Loews").  Loews owns or operates 128 theatres containing 1,424 screens at locations throughout the United States.  Loews operates theatres under the Loews Theatres, Cineplex Odeon, Star Theatres, and Magic Johnson Theatres brands.

6. On June 30, 2005, Marquee and LCE entered into a merger agreement.  Under the merger agreement, LCE would merge into Marquee and Loews will merge into AMC.  The current shareholders of LCE would control 40% of the combined company's outstanding common stock while the current shareholders of Marquee would control 60% of the combined company's outstanding common stock.

## III. BACKGROUND OF THE MOVIE INDUSTRY

7. Theatrical exhibition of feature length motion picture films ("movies") provides a major source of out-of-home entertainment in the United States.  Although they vary, ticket prices for movies tend to be significantly less expensive than many other forms of out-of-home entertainment, particularly live entertainment such as sporting events and live theatre. Movies have retained their appeal as mass entertainment: over 1.5 billion movie tickets were sold in the United States in 2004.  Total box office revenue for 2004 exceeded $9.5 billion

8. "Exhibitors" are companies that operate movie theatres. Some exhibitors own a single theatre, whereas others own a circuit of theatres within one or more regions of the United States. AMC and Loews are exhibitors and each operates one of the largest theatre circuits in the United States.

9. "Distributors" are companies that engage in the business of renting and licensing movies to exhibitors. Distributors arrange for the promotion and marketing of films and contract with exhibitors to exhibit films at theatres throughout the country. Established distributors include Sony, Paramount, Twentieth Century Fox, Universal, Disney, Warner Bros., Dreamworks, Metro-Goldwyn-Meyer, and Buena Vista.

10. Distributors negotiate with exhibitors to exhibit films. Exhibitors compete to obtain films to show at their theatres that they believe will result in high ticket sales, and distributors choose theatres to exhibit their films based on the quality, location, and grossing potential of the theatres and the particular terms offered by the exhibitors.

11. Distributors license movies by "zones" that reflect specific local areas. Typically, only one theatre within a zone will play a particular movie. There are two types of zones: "free zones" (or "non-competitive zones") and "competitive zones." Free zones contain only a single theatre. Competitive zones contain two or sometimes more theatres competing for the exclusive license to exhibit a movie within the zone.

12. The terms of the agreements pursuant to which distributors license films to exhibitors vary and are individually negotiated. Each agreement, however, typically specifies a formula pursuant to which box office revenues are divided between the exhibitor and the distributor. The agreements often provide that the exhibitor will keep a certain dollar amount

from the box office revenues to compensate for "overhead," as well as a specified percentage of what remains after the overhead is deducted.

13. Exhibitors set ticket prices for each theatre based on a number of factors, including the competitive situation facing each theatre, the prices of nearby, comparable theatres, the number and type of amenities each theatre offers, such as stadium seating, and the age of the theatre.

### IV.  RELEVANT MARKET

*A.  Product Market*

14. Movies are a unique form of entertainment. The experience of viewing a movie in a theatre is an inherently different experience from a live show, a sporting event, or viewing a DVD or videotape of a movie in the home. Typically, viewing a DVD or videotape in the home lacks several characteristics of viewing movies in theatres, including the size of screen, the sophistication of sound systems, and the social experience of viewing a movie with other patrons. Ticket prices for movies are generally very different than prices for other forms of entertainment: live entertainment is typically significantly more expensive than a movie ticket, whereas renting a DVD or videotape is usually significantly cheaper than viewing a first-run movie in a theatre. Because going to the movies is a different experience from other forms of entertainment and because movie prices are significantly different from other forms of entertainment, small but significant price increases for movie tickets generally do not cause a sufficient number of movie-goers to shift to other forms of entertainment to make the increase unprofitable.

15. A movie is considered to be in its "first-run" during the initial weeks following its release in a given locality. If successful, a movie may be exhibited at other theatres after the

first-run as part of a second or subsequent run (often called a sub-run). Tickets at theatres exhibiting sub-run movies usually cost significantly less than tickets at first-run theatres. Because the films exhibited at sub-run theatres are no longer new releases, most movie-goers do not regard sub-run films as an adequate substitute for first-run films and would not switch to sub-run films if the price of first-run films was increased by a small but significant amount.

16. Commercial movies typically appeal to different patrons than other types of movies, such as art movies or foreign language movies. For example, art films tend to appeal more universally to mature audiences and art film patrons tend to purchase fewer concessions. Theatres that primarily exhibit art films often contain auditoriums with fewer seats than theatres that primarily play commercial films. Typically, art films are released less widely than commercial films. Also, exhibitors consider art theatre operations as distinct from the operations of theatres that exhibit commercial films. Because art movies appeal to different patrons and are often exhibited in different types of theatres than commercial theatres, most movie-goers do not regard art films as an adequate substitutes for commercial films and would not switch to them if the price of commercial films was increased by a small, but significant amount.

17. Similarly, foreign language films do not widely appeal to U.S. audiences. As a result, movie-goers do not regard foreign language films as adequate substitutes for commercial films and would not switch to them if the price of commercial films was increased by a small, but significant amount.

18. Movie-goers prefer stadium seating theatres, in which each row of seats is set on a tier that is higher than the tier on which the row in front of it is set. Movie-goers will

often bypass older, slope floor theatres to view a movie at a stadium seating theatre and are willing to pay more to view movies in stadium seating theatres. Exhibitors also view stadium seating theatres as superior to slope floor theatres. Exhibitors will often look to build new stadium seating theatres in areas where only slope floor theatres, but no stadium seating theatres, exist. Almost all new theatres are stadium seating theatres.

19.   From the perspective of distributors selecting locations at which to exhibit their movies, there is no adequate substitute for theatres that exhibit first-run, commercial films. Distributors seek to have their newly released movies exhibited widely in high-quality theatres. A small but significant reduction in the rental fees paid to distributors by exhibitors would not cause the distributors to exhibit their films in anything other than first-run, commercial theatres.

20.   The relevant product market within which to assess the competitive effects of this merger is the exhibition of first-run, commercial films: from the movie-goer's perspective, the market is first-run, commercial films and from the distributors' perspective, the market is first-run, commercial theatres in which to exhibit first-run, commercial films.

*B. Geographic Markets*

21.   Movie-goers typically do not want to travel very far from their homes to attend a movie, particularly in urban areas. Accordingly, geographic markets for the exhibition of first-run, commercial movies are predominantly local.

22.   Most movie-goers in Chicago North typically are reluctant to travel significant distances out of that area to attend a movie. A small but significant price increase for movie tickets in Chicago North would not cause a sufficient number of movie-goers to travel out of Chicago North to make the increase unprofitable. Chicago North constitutes a relevant

geographic market in which to assess some of the competitive effects of this merger. AMC and Loews are the two largest exhibitors in Chicago North.

23. Most movie-goers attending movies in Midtown Manhattan are reluctant to travel to other parts of Manhattan or off the island of Manhattan to view a movie. A small but significant price increase for movie tickets in Midtown Manhattan would not cause a sufficient number of movie-goers to travel to other areas of Manhattan or out of the borough to make the increase unprofitable. Midtown Manhattan constitutes a relevant geographic market in which to assess some of the competitive effects of this merger. AMC and Loews are the two largest exhibitors in Midtown Manhattan.

24. Like movie-goers in Chicago North and Midtown Manhattan, most movie-goers in downtown Seattle typically are reluctant to travel significant distances out of downtown to attend a movie. A small but significant price increase for movie tickets in downtown Seattle would not cause a sufficient number of movie-goers to travel out of downtown to make the increase unprofitable. Downtown Seattle constitutes a relevant geographic market in which to assess some of the competitive effects of this merger. AMC and Loews are the two largest exhibitors in downtown Seattle.

25. Most movie-goers in downtown Boston typically are reluctant to travel significant distances out of downtown to attend a movie. A small but significant price increase for movie tickets in downtown Boston would not cause a sufficient number of movie-goers to travel out of the city to make the increase unprofitable. Downtown Boston constitutes a relevant geographic market in which to assess some of the competitive effects of this merger. AMC and Loews are the only two exhibitors in downtown Boston.

26.    Similarly, in north Dallas, most moviegoers typically are reluctant to travel significant distances out of the city to attend a movie.  A small but significant price increase for movie tickets in north Dallas would not cause a sufficient number of movie-goers to travel out of the city to make the increase unprofitable.  North Dallas constitutes a relevant geographic market in which to assess some of the competitive effects of this merger.  AMC and Loews are the two largest exhibitors in north Dallas.

27.    The exhibition of first-run films in Chicago North, Midtown Manhattan, downtown Seattle, downtown Boston, and north Dallas each constitutes a relevant market (*i.e.*, a line of commerce and a section of the country) within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## V.  COMPETITIVE EFFECTS

### A.  Chicago North

28.    In Chicago North, the proposed merger would give the newly merged entity control of all four major first-run, commercial theatres with 55 screens and a 2004 box office revenue of approximately $24 million.  AMC and Loews each operate theatres in two different zones in Chicago North.  The combined entity will control nearly 100% of the revenues from the two zones in Chicago North and overall would have a market share of approximately 100%.  Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), explained in Appendix A, the merger would yield a post-merger HHI of approximately 10,000, representing an increase of roughly 4,814.

### B.  Midtown Manhattan

29.    In Midtown Manhattan, the proposed merger would give the newly merged entity

control of the only first-run, commercial stadium seating theatres along with 71 total screens and 2004 box office revenue of approximately $54.6 million. The combined entity would have a market share of approximately 88%. The merger would yield a post-merger HHI of roughly 7,779, representing an increase of around 3,633. In the Times Square zone, a zone in Midtown Manhattan, AMC and Loews operate theatres in the same zone. The combined entity would control 100% of the revenue from that film zone, the highest grossing zone in the United States.

### C. Downtown Seattle

30. In downtown Seattle, the proposed merger would give the newly merged entity control of all three first-run, commercial theatres with 31 screens and a 2004 box office revenue of approximately $14.1 million. The combined entity would control nearly 100% of the revenues from the zone in downtown Seattle and a market share of 100%. The merger would yield a post-merger HHI of 10,000, representing an increase of around 4,921.

### D. Downtown Boston

31. In downtown Boston, the proposed merger would give the newly merged entity control of the only first-run, commercial theatres with 32 screens and a 2004 box office revenue of approximately $20.8 million. The combined entity would have a market share of 100%. The merger would yield a post-merger HHI of 10,000, representing an increase of approximately 4,635.

### E. North Dallas

32. In north Dallas, the proposed merger would give the newly merged entity control of three of the four first-run, commercial theatres with stadium seating, including the only two in north central Dallas. It would control all three commercial, first-run stadium seating theatres in

north central Dallas once the new AMC theatre opens in Spring 2006. Overall, the combined entity would control five of seven first-run, commercial theatres with 78 screens and 2004 box office revenues of approximately $22 million. The combined entity would have a market share of approximately 78%. The merger would yield a post-merger HHI of roughly 6,393, representing an increase of around 2,976.

### F. Consumer Effects

33. The proposed merger would likely lessen competition significantly in the relevant markets by further enhancing the ability of the remaining theatre circuits, particularly the AMC-Loews circuit, to increase prices.

   (a) AMC and Loews directly compete in all the relevant geographic markets. The prices their theatres charge are constrained by the prices charged by the other; in particular, they are constrained by the risk that the other will not follow an attempted price increase. If AMC or Loews were to increase prices and the other were not to follow, the firm that increased price might suffer financially if a substantial number of its patrons decided that the increased price was unreasonable and opted to patronize the other circuit.

   (b) The proposed merger would eliminate this pricing constraint and is therefore likely to lead to higher prices for ticket buyers.

   (c) These higher prices could take the form of a higher adult evening ticket price or reduced discounting, *e.g.*, for matinees, children, seniors, and students.

34. The proposed merger would also eliminate non-price competition between AMC

and Loews and is therefore likely to lead to lower quality theatres for movie-goers.

      (a)    In order to persuade distributors to exhibit top films in their respective theatres that share the same zones and, more importantly, to attract movie-goers, AMC and Loews strive to maintain high quality theatres.

      (b)    The loss of each other's theatres as competitors would reduce the incentive of AMC and Loews to maintain, upgrade, and renovate theatres and to improve amenities and services at theatres in the relevant markets, thus reducing the quality of the viewing experience for a movie-goer.

## VI. ENTRY

35. Entry by first-run, commercial theatres is difficult in the relevant markets. Exhibitors are often reluctant to locate new theatres near existing stadium theatres. Those who typically build new theatres, exhibitors and real estate developers, often seek to avoid building new theatres in the same zones with existing theatres. Also, exhibitors and real estate developers often seek to build new stadium theatres in conjunction with projects that contain other retail establishments, such as shops and restaurants that will be another draw for customers. As a result, real estate developers often look at the customer demand for other retail in areas in which they consider locating a theatre, along with the customer demand for a new theatre.

36. Entry by first-run, commercial theatres in Chicago North is time-consuming and difficult and is not likely to reduce significantly the market strength of the combined entity in the near future. Suitable, available sites are scarce, real estate and construction costs are among the highest in the nation, and acquiring the necessary permits and approvals can be difficult and

time-consuming. Identifying a site, planning the development, and constructing a theatre in Chicago North takes several years. No new first-run, commercial theatres with the capability to reduce significantly the newly merged entity's market power are likely to open within the next two years.

37. In Manhattan, entry by first-run, commercial theatres, particularly in Midtown, is time-consuming and difficult and is not likely to reduce significantly the market strength of the combined entity in the near future. Suitable, available sites are scarce, and real estate and construction costs are among the highest in the nation. Identifying a site, planning the development, and constructing a theatre in Midtown Manhattan takes several years. No new first-run, commercial theatres with the capability to reduce significantly the newly merged entity's market power are likely to open within the next two years.

38. Entry by first-run, commercial theatres in downtown Seattle is time-consuming and difficult and is not likely to reduce significantly the market strength of the combined entity in the near future. Suitable, available sites are scarce and acquiring the necessary permits and approvals for the construction of new theatres can be difficult and time-consuming. No new first-run, commercial theatres with the capability to reduce significantly the newly merged entity's market power are likely to open within the next two years.

39. Entry by first-run, commercial theatres in downtown Boston is time-consuming and difficult and is not likely to reduce significantly the market strength of the combined entity in the near future. Suitable, available sites are scarce and necessary permits and approvals for the construction of new theatres can be difficult and time-consuming. No new first-run, commercial theatres with the capability to reduce significantly the newly merged entity's market power are

likely to open within the next two years.

40. Entry by first-run, commercial theatres in north Dallas is difficult and is not likely to reduce significantly the market strength of the combined entity in the near future. Suitable, available sites are scarce in north central Dallas, where the combined entity's market strength would be the strongest, and no new first-run, commercial theatres with the capability to reduce significantly the newly merged entity's market power are likely to open within the next two years.

## VII.  **VIOLATION ALLEGED**

41. The United States and plaintiff states hereby reincorporate paragraphs 1 through 40.

42. On June 30, 2005, Marquee and LCE entered into a merger agreement. Under the merger agreement, LCE intends to merge into Marquee and Loews intends to merge into AMC.

43. The effect of the proposed merger would be to lessen competition substantially in interstate trade and commerce for first-run, commercial theatres in which to exhibit first-run, commercial films in Chicago North, Midtown Manhattan, downtown Seattle, downtown Boston, and north Dallas in violation of Section 7 of the Clayton Act, 15 U.S.C. 18.

44. The transaction would likely have the following effects, among others:

(a) competition for first-run, commercial theatres in which to exhibit first-run, commercial films in numerous geographic markets would be eliminated or substantially lessened; and

(b) prices for first-run, commercial film tickets would likely increase to levels above those that would prevail absent the merger.

## VIII.  **REQUESTED RELIEF**

45.     The plaintiffs request: (a) adjudication that the proposed merger would violate Section 7 of the Clayton Act; (b) permanent injunctive relief to prevent the consummation of the proposed merger and to prevent the defendants from entering into or carrying out any agreement, understanding or plan, the effect of which would be to combine the businesses or assets of defendants; (c) an award of each plaintiff of its costs in this action; and (d) such other relief as is proper.

DATED:   December __, 2005

FOR PLAINTIFF UNITED STATES OF AMERICA

_____  _____
THOMAS O. BARNETT (TB 1317)         WILLIAM H. JONES II (WJ 2563)
Acting Assistant Attorney General
Antitrust Division

_____  _____
J. ROBERT KRAMER II (RK 3921)       ALLEN P. GRUNES (AG 4775)
Director of Operations

_____  _____
JOHN R. READ (JR 8964)              GREGG I. MALAWER (GM 6467)
Chief, Litigation III

_____  _____
NINA B. HALE (NH 7828)              AVERY W. GARDINER (AG 2011)
Assistant Chief, Litigation III

_____
JOAN HOGAN (JH 5666)

Attorneys for the United States
United States Department of Justice
Antitrust Division, Litigation III
325 7th Street, N.W., Suite 300
Washington, DC 20530


_____
BERNARD M. HOLLANDER (BH 0818)
Senior Trial Attorney

FOR PLAINTIFF STATE OF NEW YORK:
Eliot Spitzer, Attorney General

_____
By: Jay L. Himes (JH 7714)
Chief, Antitrust Bureau


_____
Richard E. Grimm (RG 6891)
Assistant Attorney General


Antitrust Bureau
Office of the Attorney General
120 Broadway, Room 26C62
New York, New York 10271-0332
Tel: (212) 416-8282, (212) 416-8280

Fax: (212) 416-6015


FOR PLAINTIFF STATE OF ILLINOIS:
Lisa Madigan, Attorney General


_____
By: Robert W. Pratt (RP 7924)
Chief, Antitrust Bureau
Office of the Attorney General
State of Illinois
100 West Randolph Street
13th Floor
Chicago, Illinois 60601
(312) 814-3722

Kavita Puri
Assistant Attorney General
OF COUNSEL

FOR PLAINTIFF STATE OF MASSACHUSETTS
Thomas F. Reilly, Attorney General

_____
By: Mary Freely (MF 1359)
Jeffrey Shapiro (JS 5521)
Assistant Attorney General
Office of the Attorney General of Massachusetts
One Ashburton Place, 19th Floor
Boston, MA 02108
(617) 727-2200 ext. 2985

**EXHIBIT A**

**DEFINITION OF HHI AND**

**CALCULATIONS FOR MARKET**

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of thirty, thirty, twenty and twenty percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be concentrated. Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the Merger Guidelines. See *Merger Guidelines* § 1.51.